**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

VICKI L. SNEAD,

      Plaintiff,

                                    **Civil Action 2:19-cv-4831**
                                    **Judge Sarah D. Morrison**
      v.                            **Magistrate Judge Elizabeth P. Deavers**

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

<u>**REPORT AND RECOMMENDATION**</u>

Plaintiff, Vicki L. Snead ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits and supplemental security income benefits. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 9), the Commissioner's Memorandum in Opposition (ECF No. 15), and the administrative record (ECF No. 8). For the following reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

**I. BACKGROUND**

Plaintiff applied for disability insurance benefits and supplemental security income benefits on March 11, 2016, alleging disability beginning November 10, 2015. (R. at 198-207.) Plaintiff's claim was denied initially and upon reconsideration. (R. at 120-131.) Upon request, a hearing was held on October 10, 2018, in which Plaintiff appeared and testified. (R. at 38-56.)

A vocational expert ("VE"), George Coleman, also appeared and testified at the hearing. (*Id.*) On October 15, 2018, Administrative Law Judge Timothy G. Keller ("the ALJ") issued a decision finding that Plaintiff was not disabled. (R. at 16-37.) On August 29, 2019, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 2-7.) Plaintiff then timely commenced the instant action. (ECF No. 1.)

## II.  RELEVANT HEARING TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff testified at the July 2018 administrative hearing. (R. at 42-53.) Plaintiff testified that she last had a job at a pizza restaurant in 2014 or 2015. (R. at 42.) The ALJ questioned Plaintiff about a possible summer job she had in 2017, and Plaintiff testified that she "was never asked to work there" but she helped a friend run a karaoke system at a bar, and then at a wedding. (R. at 42-43.) Plaintiff testified that she got "a little bit of cash" for the work. (R. at 43.) Plaintiff testified that her friend would get hired to do karaoke, and she would go with him to sing karaoke at the bar. (R. at 43-44.)

Plaintiff testified that she underwent knee surgery in April 2013, and that in 2016 she was trying to regularly exercise on her own by walking. (R. at 44-45.) Plaintiff testified that she was no longer able to work because she "can't keep up." (R. at 45.) Plaintiff testified that she previously worked at a pizza shop, and she was going to be fired because she "couldn't keep up with the pace of things," but then the pizza shop ended up closing anyways. (*Id.*) Plaintiff testified that she wouldn't be able to do a job without strict production demands, even if she was allowed to sit, because of the fast pace, but then stated that it would depend on the job. (R. at 45-46.) Plaintiff testified she previously had worked at a gas station and it was fast-paced and she

2

got confused. (R. at 46.) Plaintiff testified that she would "probably not" be able to do a job standing six out of eight hours without being able to sit down and rest, because the arthritis in her knees bothers her. (R. at 47.) Plaintiff testified that she has a hard time remembering things, both long-term and short-term. (*Id.*) Plaintiff testified that she has a hard time sleeping due to sleep apnea, and that her sleeplessness depends on the night. (R. at 47-48.)

Plaintiff testified that she has no difficulty dressing herself, but she is unable to lift a 14-pound bag of dog food because she "[doesn't] have a lot of upper body strength to begin with" and she would not be able to "stoop and pick something up from the floor and to be able to push up with [her] knees." (R. at 48.) Plaintiff testified that she is left-handed, but she has no trouble using her left hand for any reason. (R. at 49.) Plaintiff testified that she still has pain from her right knee surgery, and that in January 2018 her doctor, Dr. Morris, told her she "was just going to have to deal with it." (R. at 49-51.)

Plaintiff testified that she drinks alcohol once per week, and keeps a limit of five beers when she drinks. (R. at 51.) Plaintiff testified that she had not been a daily drinker in the last fifteen years.[1] (R. at 52.) Plaintiff testified that she was abused by her father as a child, and that she can get upset if she feels like she's not doing a good enough job. (*Id.*) Plaintiff testified that in 2016, she walked out on a job after one day because she got frustrated. (R. at 52-53.)

## B.   Vocational Expert's Testimony

Mr. George Coleman testified as the VE at the administrative hearing. (R. at 53-55.) Based on Plaintiff's age, education, and work experience and the residual functional capacity

---

[1] The ALJ interrupted Plaintiff's testimony to suggest that October 2016, Plaintiff reported drinking a twelve-pack of beer per week. (R. at 52.) Plaintiff responded "[t]hat would be an exaggeration," and the ALJ responded that "the exaggeration would be yours, because that's what you said to the doctor." (*Id.*)

ultimately determined by the ALJ, the VE testified that a similarly situated hypothetical individual could perform the following jobs that exist in significant numbers in the national economy: office helper, mail room clerk, and parking lot attendant. (R. at 54.)

### III. RELEVANT RECORD EVIDENCE

**A.      James W. Whetstone, M.D.**

Plaintiff received treatment from her primary care physician James W. Whetstone, M.D., at Whetstone Medical Clinic, from January 29, 2015 through April 9, 2018. (R. at 530-572.) In her first appointment on January 29, 2015, Plaintiff complained of snoring loudly and reported bilateral knee joint pain, following a right knee replacement in April 2014. (R. at 562.) Dr. Whetstone determined Plaintiff was not in acute distress, and assessed her to have a Vitamin D deficiency, morbid obesity which was improving, hypothyroidism, generalized osteoarthritis of multiple sites (which was stable), plantar fasciitis, fatigue (which was stable), sleep apnea, and iron deficiency anemia. (R. at 564.) Plaintiff returned to Dr. Whetstone on May 11, 2015, seeking clearance for surgery for plantar fasciitis. (R. at 560-561.)

On September 14, 2015, Plaintiff returned to Dr. Whetstone reporting that she was hit by a slow-moving vehicle while crossing the street on September 1, 2015. (R. at 552-553.) Dr. Whetstone reported that the x-rays "did not reveal any acute fractures but did show degenerative changes in neck, knee, ankle and foot." (R. at 552.) Plaintiff complained of right hip and ankle pain, and Dr. Whetstone found that her hips "did not show full range of motion" and her ankle was swollen and painful at the extreme limits of the range of motion. (R. at 552-553.) Dr. Whetstone also noted that he did not find instability or weakness in Plaintiff's hips. (R. at 553.) Dr. Whetstone assessed that Plaintiff had a right ankle sprain, and a right hip contusion with intact skin surface. (*Id.*)

Plaintiff returned to Dr. Whetstone on November 3, 2016, at which time Dr. Whetstone completed a Physical/Emotional Evaluation form. (R. at 551.) Dr. Whetstone listed Plaintiffs diagnoses as including Bipolar Disorder, Hypothyroidism, Iron Deficiency Anemic, Osteoarthritis in her right knee, right ankle, left knee, and back. (*Id.*) Dr. Whetstone indicated that Plaintiff had "significant" physical limitations with regard to climbing, crouching/crawling, prolonged standing, and kneeling; that she had "mild" physical limitations with regard to balance, bending, reaching/grasping, and movement in workplace; and that she has no physical limitations with regard to transmitting and receiving information or prolonged sitting. (*Id.*) Dr. Whetstone indicated that Plaintiff had no environmental restrictions. (*Id.*) Finally, Dr. Whetstone indicated that Plaintiff had a "significant" mental health, cognitive, or behavioral limitation with regard to stress tolerance; that she had "mild" mental health, cognitive, or behavioral limitations with regard to memory, sustaining concentration, problem solving, cognition, performing activities of daily life independently, establishing and maintaining relationships, and judgment; and that she had no mental health, cognitive, or behavioral limitations with regard to organizational skills, adaptive skills, interpersonal interactions, or transmitting and receiving information. (*Id.*)

On February 22, 2017, Plaintiff reported to Dr. Whetstone that she was in the process of trying to get disability, and stated that she could not move well due to bilateral lower extremity pain. (R. at 548.) Dr. Whetstone assessed Plaintiff to have chronic peripheral venous insufficiency, obesity/fatigue, hypothyroidism, osteoarthritis of both knees, and iron deficiency anemia. (R. at 548-550.) On March 17, 2017, Plaintiff returned to Dr. Whetstone complaining of left knee pain. (R. at 545-547.) Dr. Whetstone reported that Plaintiff stated that she could not move well due to multiple areas of arthralgia, bilateral lower extremity pain, and morbid obesity.

(R. at 545.) Dr. Whetstone assessed Plaintiff to have limb pain, chronic peripheral venous insufficiency, morbid obesity, hypothyroidism, osteoarthritis of both knees, arthralgia in multiple sites, fatigue, and iron deficiency anemia. (R. at 545-547.)

At the March 17, 2017 appointment, Dr. Whetstone completed a Physical Assessment form for Plaintiff. (R. at 419-420.) Dr. Whetstone indicated that Plaintiff's symptoms were "frequently" severe enough to interfere with the attention and concentration required to perform simple work-related tasks, and that Plaintiff would need to recline or lie down during a hypothetical 8-hour workday in excess of the usual break schedule. (R. at 419.) Dr. Whetstone indicated that Plaintiff can only walk "less than 1 block" without rest or significant pain, that she can sit for seven hours in an eight hour work day, that she can stand/walk for three hours in an eight hour work day, and that Plaintiff would need three to four breaks (10-15 minutes each) during an eight hour work day. (*Id.*) Dr. Whetstone wrote that Plaintiff can "occasionally" lift and carry less than ten pounds in a competitive work situation, but should never lift and carry more than that. (*Id.*) Dr. Whetstone indicated that Plaintiff also has limitations in repetitive reaching, handling, or fingering. (*Id.*) Dr. Whetstone estimated that Plaintiff would likely be absent from work more than four times a month as a result of her impairments or treatments. (R. at 420.)

From March 17, 2017 through February 16, 2018, Plaintiff returned to Dr. Whetstone approximately five more times, and was treated for various colds, headaches, or weight loss issues. (R. at 535-547.) Plaintiff did not complain of any shoulder, knee, hip, or limb pain at these appointments. (*Id.*) At her last appointment on February 16, 2018, Dr. Whetstone assessed Plaintiff to have allergic rhinitis and hypothyroidism. (R. at 536.)

**B.**     **New Horizons Youth & Family Center**

Plaintiff sought psychiatric treatment at New Horizons Youth & Family Center ("New Horizons") from January 25, 2014 to February 10, 2015.  (R. at 332-345.)  Her records indicate she was treated for depression and anxiety, and that she remained "stable" (neither improving or worsening) from appointment to appointment.  (*Id.*)  Plaintiff only appeared for six appointments, which were approximately once every two months.  (*Id.*)  Plaintiff's discharge summary, dated June 18, 2015, indicates that Plaintiff presented with Bipolar II Disorder, that she had not achieved her goals, and that she was being discharged because she had not kept scheduled appointments and had not responded to requests to schedule appointments. (R. at 344.)

**C.**     **Access Ohio Johnson Health; Maryam Niazi, PMHNP**

Plaintiff sought additional psychological counseling at Access Ohio Johnson Health, from October 20, 2015 through August 1, 2016.  (R. at 351-362, 371-374, 401-415.)  At her first visit on October 20, 2015, Plaintiff complained that she didn't feel like she had been helped by New Horizons, and that she "felt that the staff and doctors [at New Horizon] wanted her to be drugged and didn't help her find other coping skills on how to deal with her symptoms."  (R. at 351.)  Plaintiff reported "that she had bipolar but she doesn't know if she does."  (*Id.*)  Plaintiff reported that she tends to overeat at times, even when she isn't hungry, and that her pain "comes and goes but mainly hurts during winter months."  (R. at 356.)

Plaintiff reported having depression since childhood, resulting in sadness, fatigue, lack of energy, aches and pain, low self esteem and confidence, her mind going blank, and memory problems.  (*Id.*)  Plaintiff also stated she has panic attacks during life transitions and getting to work, that she worries constantly about how long she has to live with her mother, and that she does not like change.  (*Id.*)  Plaintiff also stated that she has a "short fuse," and she finds it

difficult to focus and prioritize due to her hot temper and trouble focusing.  (R. at 357.)  Plaintiff

reported that she was sober for five years, but her drinking had gotten worse since splitting up

with a boyfriend.  (*Id*)  Plaintiff stated that she buys alcohol until she runs out of money.  (*Id.*)

Plaintiff noted that her psychosocial stressors were "[n]ot finding a second job, being laid off,

trying to find transportation, [and] [being] responsible for her bills."  (*Id.*)  Jennifer Bloom,

LSW, provided the intake and concluded that Plaintiff met the criteria for:  eating disorder,

unspecified; attention deficient hyperactivity disorder, unspecified type; alcohol use, unspecified

with other alcohol-induced disorder; bipolar disorder, current episode mixed moderate;

dysthymic disorder; and adjustment disorder with anxiety.  (R. at 360.)  Ms. Bloom stated the

"symptoms appear to be chronic," and noted that Plaintiff appeared to be highly motivated for

treatment.  (*Id.*)

      Plaintiff returned for counseling a total of eight times, approximately once per month,

between December 30, 2015 and August 1, 2016.  (R. at 371-374, 401-415.)  During these visits,

Plaintiff's primary provider was Maryam Niazi, PMHNP.  (*Id.*)  On August 1, 2016, Ms. Niazi

completed a Mental Status Questionnaire for Plaintiff, for the Opportunities for Ohioans with

Disabilities Division of Disability Determination.  (R. at 398-400.)  In the questionnaire, Ms.

Niazi wrote that Plaintiff gets overwhelmed easily due to severe anxiety, that she gets agitated,

and that she does not have a learning disability but rather displays lack of insight.  (R. at 398.)

Ms. Niazi found that Plaintiff has limited cognitive functioning, and wrote that Plaintiff displays

lack of judgment, poor coping skills, acts much younger than her age, and is impulsive.  (*Id.*)

      Ms. Niazi wrote that Plaintiff would be capable of managing any benefits that may be

due, but that due to a possible learning disability Plaintiff might be unable to follow instructions.

(R. at 399.)  Ms. Niazi reported Plaintiff's very poor ability to maintain attention, adding that

Plaintiff was "all over the place" and "tangential at times." (*Id.*)  When asked how Plaintiff would react to the pressures, in work settings or elsewhere, involved in single and routine, or repetitive, tasks, Ms. Niazi answered that Plaintiff would do "very very poor[ly]" because she is not good with change. (*Id.*)  Ms. Niazi observed that Plaintiff gets stuck at one point at a time and displays obsessive tendencies and a tangential thought process. (*Id.*)

On March 8, 2017, Ms. Niazi completed a Mental Capacity Assessment form regarding Plaintiff's ability to do work-related activities on a day-to-day basis in a regular work setting. (R. at 416-418.)  Ms. Niazi indicated that Plaintiff had "moderate" and "marked" limitations with regard to her understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (*Id.*)

### D.     Integrated Services for Behavioral Health

Plaintiff also sought psychiatric treatment from Integrated Services for Behavioral Health, from April 20, 2017 to June 7, 2018. (R. at 463-483, 573-633.)  During her intake appointment on April 20, 2017, Plaintiff stated that she was seeking help with housing and receiving benefits. (R. at 476.)  Plaintiff was assessed a GAF score of 48, meaning that she had "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." (R. at 481.)  Plaintiff was diagnosed under the DSM-V with Generalized Anxiety Disorder, by meeting the following criteria:  "muscle tension; sleep disturbance; being easily fatigued; irritability; restlessness or feeling keyed up or on edge; and the anxiety, worry, or physical symptoms caus[ing] clinically significant distress or impairment." (R. at 482-483.)

Plaintiff returned for approximately fourteen visits between August 11, 2017 and June 7, 2018. (R. at 463-475, 573-633.)  On August 11, 2017, Plaintiff denied having a depressed mood,

but reported excessive worrying and difficulty controlling her worries.  (R. at 468.)  On January

11, 2018, Plaintiff reported her depression being "in the middle" and that she had "moderate

anxiety" following a domestic violence incident.  (R. at 629.)  On March 19, 2018, Plaintiff

sought refills of her medications, which the treatment provider wrote "doesn't make sense,

because I gave her a RX with 1 refill on January 17."  (R. at 607.)  At that same appointment,

Plaintiff reported that her depression was "not too bad" and that "I haven't really been anxious."

(*Id.*)  On May 24, 2018, Plaintiff sought more refills of her medications, and the treatment

provider again noted that "she should still have at least one refill at her pharmacy."  (R. at 594.)

Plaintiff reported at that time that she was bored, but that she felt "not too much" depression and

"not much" anxiety.  (*Id.*)  On May 31, 2018, Plaintiff stated that one of her goals of treatment

was "[f]inding a part time job," but that transportation was an obstacle to that goal.  (R. at 578.)

The Progress Note from her last appointment, on June 7, 2018, states that Plaintiff had made no

progress from the treatment.  (R. at 573.)

**E.      Marc E.W. Miller, Ph.D.**

On June 14, 2016, Plaintiff was evaluated by Dr. Marc Miller, upon referral by the

Opportunities for Ohioans with Disabilities, for a psychological evaluation relating to her claim

for mental disability benefits.  (R. at 392-397.)  Dr. Miller noted that he reviewed primary

information from New Horizons Mental Health, but no testing was requested or conducted, no

supervisee was present, and all information was gathered from Plaintiff.  (R. at 392.)  Dr. Miller

noted that Plaintiff "was a rather poor informant in regard to her memory of dates and specific

information due to her long term memory problems," but added that "[n]o inconsistencies were

noted when compared to the chart."  (R. at 394.)

Plaintiff reported to Dr. Miller complaints regarding her feet, knees, and shoulder, as well as a long history of depression and anxiety. (R. at 392.) Plaintiff described her difficult childhood and personal history for Dr. Miller, and told Dr. Miller that she has had chronic anxiety and depression since age 12 or 13. (R. at 393.) Plaintiff reported two suicide attempts as an adolescent, and more recent suicide attempts around 2010 and 2013. (*Id.*) Plaintiff reported attending Access Ohio Mental Health twice per month, and that she was being treated for depression. (*Id.*) Plaintiff reported getting depressed related to money issues, and she stated that she has a bad relationship with her daughter. (R. at 394.) Plaintiff also complained of agitation, impatience, and irritability. (*Id.*)

Dr. Miller found that Plaintiff's medical history "suggests she suffers from plantar fasciitis to both feet and arthritis in her knees and shoulder," and that she has difficulty with left shoulder pain and anemia. (R. at 393.) Dr. Miller added that Plaintiff is obese, and that she had a gastric bypass surgery in 2000, a bilateral leg vein surgery, and a partial right knee replacement surgery after being hit by a car in November 2015. (*Id.*) Dr. Miller noted Plaintiff's "mild to moderate hearing loss in both ears," and observed that Plaintiff walked with a slow gait and a significant limp. (R. at 393-394.)

With regard to Plaintiff's sensorium and cognitive functioning, Dr. Miller found that Plaintiff has difficulty with short and long-term recall, has fair concentration, and has problems keeping her mind on tasks. (R. at 394.) Dr. Miller found that Plaintiff's executive skills note moderate problem solving and organizational abilities. (*Id.*) Dr. Miller wrote that Plaintiff's abstract thinking was poor, and while she was able to follow one or two step instructions, Plaintiff indicated that she is typically very slow. (*Id.*) Dr. Miller estimated Plaintiff's intellect to be within the low average range. (*Id.*) Regarding Plaintiff's daily activities, Dr. Miller

reported that Plaintiff goes to bed at all hours, eats two meals per day, has no hobbies, but that she prepares her own meals and laundry, she does her own housecleaning, and she goes to the grocery store on her own.  (R. at 395.)  Dr. Miller also added that Plaintiff reported "always [taking] care of her own money management.  (*Id.*)

Dr. Miller assessed that Plaintiff's "abilities and limitations in regard to understanding, remembering, and carrying out one and two step job instructions indicate difficulty."  (*Id.*)  Dr. Miller noted that Plaintiff was fired from her last job "due to being too slow," and wrote that "[t]his has been a problem for her in regard to employment."  (*Id.*)  Dr. Miller found that Plaintiff "avoids others and becomes anxious around people," and that "[h]er abilities and limitations in regard to dealing with stress and pressure in a work setting indicate difficulty."  (*Id.*)  Dr. Miller specifically discussed that Plaintiff has had panic attacks in the past, and that she has issues with anxiety and has difficulty working with the public.  (*Id.*)

Dr. Miller concluded that Plaintiff exhibited depression and anxiety.  (R. at 396.)  Dr. Miller noted that Plaintiff was diagnosed with bipolar disorder by a psychiatrist in the past, but wrote that "[t]here does not appear to be significant evidence of bipolar disorder."  (*Id.*)  Dr. Miller diagnosed Plaintiff under the DSM-V with dysthymic disorder – moderate to severe, and generalized anxiety disorder – moderate to severe.  (*Id.*)

## F.     State Agency Consultants

State Agency consultant Gerald Klyop, M.D., reviewed Plaintiff's file on May 17, 2016, and provided assessments of Plaintiff's physical residual functional capacity.  (R. at 86-101.) Specifically, Dr. Klyop found that Plaintiff could occasionally lift and/or carry up to 10 pounds; frequently lift and/or carry less than 10 pounds; stand and/or walk (with normal breaks) for a total of about two hours; sit (with normal breaks) for about six hours in an eight-hour workday;

was occasionally limited in climbing ramps/stairs, stooping (i.e., bending at the waist), crouching (i.e., bending at the knees), and crawling; was frequently limited in balancing; was limited in reaching overhead to her left; had no other postural, manipulative, visual, or communicative limitations; and had some environmental limitations, as she "would need to avoid hazards such as working around heights, dangerous moving machinery and driving as part of work due to anemia, obesity."  (R. at 96-97.)  Dr. Klyop also found that Plaintiff had mild restrictions in her activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation. (R. at 93.)  Dr. Klyop found Plaintiff to be a "poor historian," and found that her allegations were "not consistent [with] the evidence in file."  (R. at 88, 95.)

Dr. Klyop reviewed Dr. Miller's opinion, giving it "great weight" and noting that it was "consistent with the objective evidence in file."  (R. at 95.)  Dr. Klyop also reviewed a Mental Residual Functional Capacity Assessment provided by Jaime Lai, Psy.D.  (R. at 98.)  Dr. Lai found that Plaintiff "is limited to performing simple, routine, one to three step tasks in work setting not involving frequent change or fast-paced production."  (*Id.*)  Dr. Klyop ultimately concluded that Plaintiff was not disabled, with the following explanation:

> You said you were disabled due to depression, anemia, knee pain, obesity, bipolar, left should[er] pain and memory problems. Medical evidence shows that you would have some limitations due to your physical impairments. Evidence shows you can still lift light weight. Although you cannot stand for long periods of time you are able to remain seated for long time periods without any problem. Medical evidence also shows that you would have some limitations due to your mental health symptoms. However, you are still able to think and act in your interest, communicate your needs, and understand, remember and follow simple task instructions. We do not have sufficient vocational information to determine whether you can perform any of your past relevant work. However, based on the evidence in file, we have determined that you can adjust to other work.

(R. at 100-101.)

13

State Agency consultant Stephen Sutherland, M.D., reviewed Plaintiff's file at the reconsideration level on August 10, 2016, and agreed with most of Dr. Klyop's above assessments. (R. at 103-118.) As to Plaintiff's environmental limitations, Dr. Klyop found that Plaintiff should avoid concentrated exposure to extreme cold and vibration, in addition to avoiding all exposure to hazards. (R. at 114.) Dr. Sutherland reviewed Ms. Diaz's opinion as well as Dr. Miller's opinion, affording Ms. Diaz's opinion "little weight" because "[h]er opinion was not justified or supported by other file evidence," and affording Dr. Miller's opinion "great weight" because it was "consistent with the objective evidence in file." (R. at 112.) Dr. Sutherland also reviewed a Mental Residual Functional Capacity Assessment provided by Stanley Kravitz, Ph.D. (R. at 115-116.) Dr. Kravitz found that Plaintiff "is limited to performing simple, routine, one to three step tasks in work settings not involving frequent change or fast-paced production." (R. at 115.) Dr. Sutherland also concluded that Plaintiff was "Not Disabled," and provided following explanation:

> On your application, you stated you were disabled due to depression, anemia, knee pain, obesity, bipolar, left should[er] pain and memory problems. On appeal, you alleged problems with your hearing. Medical records show that you can recognize 100% of words. Your condition does prevent prolonged standing and walking. However, you would be able to walk and/or stand for a couple of hours of the workday and can sit for at least 6 hours of a workday with normal breaks. You can perform light amounts of lifting or approximately 5 pounds on a regular basis not to exceed 10 pounds. You are still able to understand, remember, and carry out simple work-related instructions. We do not have sufficient vocational information to determine whether you can perform any of your past relevant work. However, based on the evidence in file, we have determined that you can adjust to other work.

(R. at 118.)

14

## IV. ADMINISTRATIVE DECISION

On October 15, 2018, the ALJ issued his decision. (R. at 16-37.) At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff has not engaged in any disqualifying substantial gainful activity since January 28, 2016. (R. at 22.) At step two, the ALJ found that Plaintiff has the following severe impairments: obesity; degenerative joint disease of the bilateral knees; anemia; left shoulder tendonitis; varicose veins; depressive disorder; anxiety disorder; and bipolar disorder. (*Id.*) The ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23.)

At step four of the sequential process, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she is limited to occasional climbing of ramps or stairs; never climbing ladders, ropes, or scaffolds; frequent balancing; occasional

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

    1.     Is the claimant engaged in substantial gainful activity?

    2.     Does the claimant suffer from one or more severe impairments?

    3.     Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

    4.     Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

    5.     Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

> stooping, kneeling, crouching, or crawling; no exposure to moving machinery or unprotected heights; occasional exposure to extreme cold and vibration; and no commercial driving. Mentally, she retains the ability to understand, remember, and carry out simple repetitive tasks and she is able to adapt to simple changes and avoid hazards in a setting without strict production quotas.

(R. at 25.) The ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. at 26.)

The ALJ addressed each of Plaintiff's impairments. First, as for Plaintiff's alleged knee pain, the ALJ noted that Plaintiff's complaints were intermittent, and the ALJ cited medical records from 2016, 2017, and 2018 in which Plaintiff reported no muscle aches or joint pain/arthralgias, then reported of pain and stiffness, and then did not report any knee pain. (R. at 26.) The ALJ also reviewed Plaintiff's physical examinations, finding that they were "generally unremarkable," and while Plaintiff sometime displayed a slow gait and/or a limp, she also displayed a normal gait and stance by March 2017. (*Id.*) Finally, the ALJ noted that diagnostic imaging for Plaintiff's knee was "largely unremarkable as well." (R. at 27.) Next, the ALJ analyzed Plaintiff's left shoulder pain, concluding that while "the record shows some complaints of pain, [] these complaints were intermittent and no significant findings in the shoulder were noted upon examination." (*Id.*) The ALJ considered Plaintiff's left shoulder impairing in limiting her to the light level of exertion, but wrote that "a lack of recent complaints of shoulder pain supports no further specific manipulative limitations due to this condition." (*Id.*) The ALJ also reviewed Plaintiff's varicose vein impairment and obesity in determining her exertional level, postural, and environmental limitations. (*Id.*)

16

The ALJ also spent considerable time reviewing Plaintiff's mental limitations, concluding that "[t]he record is also not fully supportive of the degree of mental limitation [Plaintiff] has alleged." (R. at 27-31.) The ALJ cited Plaintiff's inconsistent complaints and examinations, dating from 2015 through 2018 that "are particularly illuminating as they reveal a depressed and anxious mood at times, but are generally unremarkable otherwise." (*Id.*) The ALJ also considered several medical opinions. (R. at 29-31.) First, the ALJ considered the reviewing physician opinions with the State Agency Division of Disability Determinations, at both the initial and reconsideration levels, affording them little weight because "their opinions are simply not well-supported by the medical evidence of record." (R. at 29.) Next, the ALJ considered the State Agency psychological consultants at the initial and reconsideration levels, affording them some weight. (R. at 29-30.) The ALJ did not accept their mental RFC conclusions wholesale, finding that "there is new and material evidence," and that "these opinions are only partly supported by the more recent objective record, which shows an intermittent history of complaints of depression and anxiety, but very few findings during mental status examinations." (*Id.*)

The ALJ also considered Dr. Miller's June 14, 2016 opinion, giving the opinion some weight "as it was made after a thorough examination of the [Plaintiff] and is somewhat consistent with the broader record." (R. at 30.) The ALJ found that Dr. Miller's opinion was vague as to the degree of difficulty Plaintiff may experience, and that "the record supports a greater aptitude socially than [Dr. Miller] opined." (*Id.*) The ALJ next reviewed Ms. Niazi's opinion, affording it little weight because "Ms. Niazi does not qualify as an 'acceptable medical source' as defined by 20 CFR 416.902" and "[m]ore importantly, Ms. Niazi's opinions are highly inconsistent with the objective record." (*Id.*) The ALJ reviewed Dr. Whetstone's March 17, 2017 opinion, but also gave it little weight because "[t]his opinion is not supported in the

broader objective medical record, and it does not include any narrative support for the severe

limitations." (R. at 30-31.) Finally, the ALJ also reviewed Dr. Whetstone's November 3, 2016

opinion, giving it more weight, "as it is a closer reflection of [Plaintiff's] limitations as supported

by the objective record." (R. at 31.)

Relying on testimony from the VE, the ALJ found that considering Plaintiff's age,

education, work experience, and RFC, she can perform jobs that exist in significant numbers in

the national economy, including office helper, mail room clerk, and parking lot attendant. (R. at

31-32.) He therefore concluded that Plaintiff was not disabled under the Social Security Act.

(*Id*.)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. §

405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI. ANALYSIS

Plaintiff puts forth two assignments of error, namely that the ALJ rendered an RFC entirely inconsistent with the opinion evidence of record regarding Plaintiff's physical limitations, and that the ALJ failed to follow Social Security guidelines in evaluating the mental health evidence of record. (ECF No. 9 at PAGEID ## 683-695.) Specifically, Plaintiff argues that the opinions of Dr. Whetstone and the State Agency consultants were consistent with one another, as well as the objective findings of record, and supported a more restrictive RFC than the ALJ provided. (*Id.* at PAGEID # 683.) Plaintiff argues that those opinions "demand[] that [Plaintiff] be limited to sedentary work," but the ALJ's RFC allowed for light work. Plaintiff contends that "the ALJ's error in evaluating the opinion evidence substantially affected [Plaintiff's] claim on the merits and resulted in reversible legal error." (*Id.* at PAGEID # 686.) Plaintiff highlights the ALJ's reliance on unremarkable diagnostic imaging and Plaintiff's normal gait, arguing that "[t]he ALJ's use of weak, scattered data points throughout the record to try and discredit the opinion evidence was inappropriate." (*Id.* at PAGEID # 689.) Plaintiff also

argues that the ALJ had a duty under the Social Security regulations to follow up with any consultative opinions he found to be inadequate, but he failed to do so despite admitting that he found Dr. Miller's opinion to be vague.  (*Id.* at PAGEID ## 690-695.)  Plaintiff argues that ALJ either impermissibly omitted limitations from Dr. Miller's opinion, or the ALJ failed to follow up with Dr. Miller for clarification, but in either event the ALJ committed reversible error.  (*Id.*)

In response, the Commissioner maintains that the ALJ properly weighed the opinion evidence in the record.  (ECF No. 15 at PAGEID ## 712-719.)  Specifically, the Commissioner argues that the ALJ "gave several reasons for not adopting Dr. Whetstone's opinion," that the ALJ "did not cherry pick the record," and that the ALJ's reliance on objective medical evidence is appropriate under the Social Security guidelines.  (*Id.*)  The Commissioner maintains that the ALJ provided "good reasons" for not adopting Dr. Whetstone's opinion, and that substantial evidence supported the ALJ's opinion.  (*Id.*)  As to Plaintiff's second argument, the Commissioner responds that "Dr. Miller did not assess specific functional limitations," and that because Dr. Miller only noted that Plaintiff's abilities "indicate difficulty" in several functional areas, "the ALJ properly concluded that the opinion was vague."  (*Id.* at PAGEID # 720.)  The Commissioner also contends that the ALJ declined to adopt other medical opinion evidence because "more recent objective evidence showed an intermittent history of complaints of depression and anxiety but very few findings during mental status examinations," so "even if Dr. Miller's opinion was consistent with their opinions, the ALJ would not have been required to credit his findings."  (*Id.* at PAGEID # 722.)  Finally, the Commissioner argues that "[t]here is nothing in the regulations that require the ALJ to recontact a physician when they provide an opinion that is inconsistent with other substantial evidence in the record," and because the ALJ

concluded that Dr. Miller's opinion was "vague as to the degree of difficulty that Plaintiff might experience, and that the record supported a greater aptitude socially than [Dr. Miller] opined," but did not conclude that Dr. Miller's report was incomplete, the ALJ was not required to recontact Dr. Miller.  (*Id.* at PAGEID # 724.)

Although Plaintiff presents her arguments as one error (that "the ALJ committed reversible error in failing to properly evaluate the opinion evidence of record"), the Court interprets Plaintiff's general argument as two-fold:  first, whether the ALJ improperly rendered an RFC inconsistent with the opinion evidence; and second, whether the ALJ failed to follow Social Security guidelines in evaluating the mental health evidence of record, especially as to Dr. Miller's opinion.  The Court will analyze each of these issues separately.

**A.      The ALJ provided good reasons for affording Dr. Whetstone's opinion little weight, and the ALJ's RFC was supported by substantial evidence.**

As a preliminary matter, the determination of a claimant's RFC is an issue reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d), 416.927(d).  Nevertheless, substantial evidence must support the Commissioner's RFC finding.  *Berry v. Astrue*, No. 1:08-cv-411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).  An ALJ must explain how the evidence supports the limitations that he or she sets forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96-8p, 1996 WL 374184, at *7 (internal footnote omitted).

21

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(c). The applicable regulations define medical opinions as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(1). The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R. § 416.927(c)(2); *Blakley*, 581 F.3d at 408. If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, then the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.*

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make

22

clear to any subsequent reviewers the weight the adjudicator gave to the treating source's

medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x

543, 550 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the

Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the
> disposition of their cases," particularly in situations where a claimant knows that
> his physician has deemed him disabled and therefore "might be especially
> bewildered when told by an administrative bureaucracy that she is not, unless some
> reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d
> Cir.1999). The requirement also ensures that the ALJ applies the treating physician
> rule and permits meaningful review of the ALJ's application of the rule. *See
> Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important

when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v.

Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors

within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir.

2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to

explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical

opinion evidence within the written decision). Finally, the Commissioner reserves the power to

decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d).

Although the ALJ will consider opinions of treating physicians "on the nature and severity of

your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled

to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir.

2007).

     Here, Dr. Whetstone issued a medical opinion as Plaintiff's treating physician.

Accordingly, his opinion is entitled to controlling weight if it is "well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the Plaintiff's] case record . . . ." 20 C.F.R. § 404.1527(c)(2).[3] The ALJ found that Dr. Whetstone's opinion did not meet this standard, because his opinion "is not supported in the broader objective medical record, and it does not include any narrative support for the severe limitations." (R. at 31.) The ALJ cited "largely unremarkable" physical examinations and diagnostic imaging, noted that "[t]here is no objective evidence that would support such severe physical limitations," and observed that Plaintiff's own testimony set forth lesser limitations than were in Dr. Whetstone's opinion. (*Id.*)

In her Statement of Specific Errors, Plaintiff asks the Court to consider Dr. Whetstone's opinion in light of the State Agency consultants' opinions, arguing that the opinions "were consistent with one another, and both called for a more restrictive RFC than the ALJ provided." (ECF No. 9 at PAGEID # 683.) Plaintiff also argues that "every other opinion of record was consistent with the opinions of Dr. Whetstone and the state reviewers, and the objective findings of record support the opinion evidence." (*Id.*) As the Commissioner correctly points out, however, Plaintiff did ***not*** challenge the reasoning provided by the ALJ for not affording Dr. Whetstone's opinion controlling weight. (ECF No. 15 at PAGEID # 714.)

Plaintiff's silence is resounding. In her Statement of Specific Errors, Plaintiff was unable to refute any of the ALJ's three reasons for affording "little weight" to Dr. Whetstone's opinion: first, that Plaintiff had "largely unremarkable" physical examinations and diagnostic imaging", making it inconsistent with other substantial evidence in the record; second, that "[t]here is no

---

[3] This standard changed for claims that were filed on or after March 27, 2017. Plaintiff, however, Plaintiff filed her claim on March 11, 2016. *See* 82 Fed. Reg. 5844 (Stating that, beginning with claims filed on or after March 27, 2017, the Social Security Administration will not give controlling or specific weight to any medical opinion or "prior administrative medical finding," including those from the claimant's "medical sources.").

objective evidence that would support such severe physical limitations"; and third, that Plaintiff's own testimony set forth lesser limitations than were in Dr. Whetstone's opinion. For the reasons discussed below, the Undersigned finds that the ALJ provided "good reasons" for not affording Dr. Whetstone's opinion controlling weight.

First, Plaintiff affirmatively concedes multiple times that her physical examinations and diagnostic imaging were "unremarkable." (ECF No. 9 at PAGEID ## 688 ("Unremarkable imaging and a normal gait should not be enough to discredit wholesale consistent sets of opinion evidence by valuable medical sources."), 689 ("The idea that unremarkable imaging and a normal gait are enough to discredit the opinion evidence of record is absurd . . . ."), 689 ("Unremarkable imaging and normal gait are not enough to entirely disregard consistent sets of opinion evidence from social security experts and a treating physician.").) Additionally, instead of identifying any substantial medical record evidence that would support Dr. Whetstone's opinion, Plaintiff focuses on other opinion evidence. While other opinion evidence is important, it is not dispositive. *Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 723–24 (6th Cir. 2004) ("The regulation requires ALJs to look to the record *as a whole*—not just to medical opinions— to decide whether substantial evidence is inconsistent with a treating physician's assessment.") (emphasis in original).

Plaintiff also argues that "[m]ultiple knee surgeries, plant[a]r fasciitis, and getting hit by a car are ***strong indicators*** that she will have standing and walking limitations with an inability to perform light levels of work where she will have to be on her feet for substantial hours of the day," but this is not the standard. (ECF No. 9 at PAGEID ## 685-686 (emphasis added).) The Court does not look for "strong indicators" from which conclusions can be drawn. Instead, it measures whether the ALJ's decision is supported by looking for medically acceptable clinical

and laboratory diagnostic techniques and substantial evidence. Here, Plaintiff provides none to combat the ALJ's reasoning. If Plaintiff's position was adopted, the ALJ would be free to substitute his or her findings and opinions with regard to the evidence, which the law prohitis. *Merrill v. Comm'r of Soc. Sec.*, No. 2:14-CV-262, 2015 WL 571008, at *14 (S.D. Ohio Feb. 11, 2015), *report and recommendation adopted sub nom. Merrill v. Colvin*, No. 2:14-CV-262, 2015 WL 1637435 (S.D. Ohio Apr. 13, 2015) ("It is well settled that ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.") (internal citation omitted). Finally, Plaintiff does not dispute that her own testimony undermines Dr. Whetstone's opinion, including her testimony that "walking is about the thing" she can do for exercise, or her testimony that the reason she cannot work is because she "can't keep up" with the pace. (R. at 45.) The Undersigned therefore agrees with the Commissioner that it was appropriate for the ALJ to afford Dr. Whetstone's opinion "little weight," rather than controlling weight and that the decision is supported by substantial evidence.

That conclusion does not end the inquiry, however, as Plaintiff also argues that "it cannot be said that the ALJ's evaluation and ultimate RFC allowing for light work was supported by substantial evidence when it is inconsistent with every opinion source of record." (ECF No. 9 at PAGEID # 694.) Plaintiff argues that because Dr. Whetstone's opinion is consistent with the State Agency consultants, "and all [opinions] draw on support from objective medical findings," it was inappropriate for the ALJ not to limit Plaintiff to sedentary work. (*Id.* at PAGEID # 684-686.) The Undersigned agrees with the Commissioner, however, Plaintiff's position does not accurately reflect the proper legal standard. (ECF No. 15 at PAGEID # 717, n. 8 ("It is well settled that '[t]he presence of substantial evidence to support the opposite conclusion says nothing about whether the record would permit either conclusion to be drawn, and has

consistently been rejected as a basis for overturning an ALJ's decision.'" (citation omitted)).)

Indeed, "there is no regulatory requirement that an ALJ adopt every facet of a particular medical

opinion in formulating an RFC, so long as the record as a whole supports the RFC actually

determined by the ALJ, and she adequately explains her analysis in a manner sufficient to allow

review." *Kincaid v. Comm'r of Soc. Sec.*, No. 1:16-CV-736, 2017 WL 9515966, at *3 (S.D.

Ohio June 12, 2017), *report and recommendation adopted*, No. 1:16CV736, 2017 WL 4334194

(S.D. Ohio Sept. 30, 2017).  A disagreement with how the ALJ decided to weigh differing

medical opinions "is clearly not a basis for . . . setting aside the ALJ's factual findings." *Id.*

(citing *Mullins v. Sec'y of Health & Hum. Servs.*, 836 F.2d 980, 984 (6th Cir. 1987)).  Further,

"there is no requirement that an ALJ adopt a state agency [consultant's] opinions verbatim; nor is

the ALJ required to adopt the state agency [consultant's] limitations wholesale." *Reeves v.

Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) (citations omitted).

      Here, the Undersigned finds that the ALJ's decision is supported by substantial evidence,

including the ALJ's finding that Plaintiff "has the residual functional capacity to perform light

work" instead of sedentary work, as Plaintiff suggests.  After considering the entire record,

including not only Dr. Whetstone and the two State Agency consultants' opinions but also the

opinions of Dr. Miller and Ms. Niazi, the ALJ cited substantial evidence in concluding that

Plaintiff is capable of light work with various exertional, postural, and environmental limitations.

(R. at 25-31.)  Substantial evidence supports the ALJ's conclusions, including records that reflect

(1) Plaintiff's physical examinations, which were generally unremarkable aside from intermittent

pain and tenderness; (2) Plaintiff's diagnostic imaging, which was unremarkable; (3) Plaintiff's

hearing testimony, which was at least partially inconsistent with Plaintiff's argument that she

needed to be limited to sedentary work; and (4) Plaintiff's mental examinations, which "reveal a

depressed and anxious mood at times, but are generally unremarkable otherwise." (*Id.*)  To the extent Plaintiff challenges any differences between the medical opinions in the record and the ALJ's RFC, these critical pieces of substantial evidence support the ALJ's RFC.  The Court must therefore defer to the ALJ's RFC.  *Nash v. Comm'r of Soc. Sec.*, No. 19-6321, 2020 WL 6882255, at *4 (6th Cir. Aug. 10, 2020) ("Even if the record could support an opposite conclusion, we defer to the ALJ's finding because it is supported by substantial evidence, based on the record as a whole.") (internal citations omitted).

To be clear, an ALJ is not required to mirror or parrot medical opinions verbatim.  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009).  While Plaintiff may have preferred a different RFC than the one determined by the ALJ, the ALJ thoroughly explained the bases for the RFC determination, including as it relates to Dr. Whetstone's proposed limitations, and the ALJ's explanation enjoys substantial support in the record.  *Dickinson v. Comm'r of Soc. Sec.*, No. 2:19-CV-3670, 2020 WL 4333296, at *11 (S.D. Ohio July 28, 2020), *report and recommendation adopted*, No. 2:19-CV-3670, 2020 WL 5016823 (S.D. Ohio Aug. 25, 2020) (citing *Schmiedebusch v. Comm'r of Soc. Sec.*, 536 F. App'x 637, 649 (6th Cir. 2013); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) ("The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.")).  Under these circumstances, the Undersigned finds no merit to Plaintiff's first statement of error.

## B.     Dr. Miller's opinion was adequate and complete.

The second issue Plaintiff raises in her Specific Statement of Errors is that the ALJ either failed to properly evaluate Dr. Miller's opinion, or the ALJ failed to contact Dr. Miller.  The ALJ

must consider all medical opinions that they receive in evaluating a claimant's case. 20 C.F.R. §§ 404.1527(c), 416.927(c). With respect to a consultative examiner's report, the ALJ will review the report to determine whether the specific information requested has been furnished. 20 C.F.R. § 404.1519p(a). If the ALJ determines that the report is "inadequate or incomplete," then the ALJ will contact the consultative examiner to request the missing information or a revised report. 20 C.F.R. § 404.1519p(b).

"Adequacy" refers to whether the report provides "evidence which serves as an adequate basis for decisionmaking in terms of the impairment it assesses." 20 C.F.R. § 404.1519p(a)(1); *see also Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 122 (6th Cir. 2016). A complete report will generally include: (i) the claimant's chief complaint(s); (ii) a detailed description, within the area of the examiner's specialty, of the history of such complaint(s); (iii) a description and disposition of pertinent findings from examination or testing; (iv) the results of any testing performed; (v) the claimant's diagnosis and prognosis; and (vi) a medical opinion. 20 C.F.R. §§ 404.1519n(c), 416.919n(c); *see also Shoults v. Comm'r of Soc. Sec.*, No. 2:19-CV-1425, 2020 WL 4782859, at *3 (S.D. Ohio Aug. 18, 2020) (citing *Baker v. Comm'r of Soc. Sec.,* No. 2:19-cv-4323, 2020 WL 2213893, at *8 (S.D. Ohio May, 7, 2020)); 20 C.F.R. §§ 404.1519n(d), 416.919n(d) ("When the evidence we need does not require a complete consultative examination . . . , we may not require a report containing all of the elements in paragraph (c)."). However, "the absence of a medical opinion in a consultative examination report will not make the report incomplete." 20 C.F.R. §§ 404.1519n(c)(6), 416.919n(c)(6).

Here, Plaintiff seizes on the ALJ's remark that Dr. Miller's opinion was "vague as to the degree of difficulty Ms. Snead may experience," and argues that through this comment the ALJ "admitted" that Dr. Miller's opinion was inadequate. (ECF No. 9 at PAGEID # 692 (citing R. at

30).) Plaintiff therefore asserts that the ALJ's failure to follow up with Dr. Miller constituted reversible error under the Social Security Guidelines. (*Id.*)

Contrary to Plaintiff's position, however, Dr. Miller's opinion was complete and adequate. First, Dr. Miller's opinion reports Plaintiff's chief complaints of feet, knee and shoulder pain, together with depression and anxiety. (R. at 392.) Next, Dr. Miller detailed Plaintiff's background information and current mental status, including his findings and results from his examination and testing of Plaintiff. (R. at 392-395.) Finally, Dr. Miller provided a functional assessment and diagnosis for Plaintiff, and then summarized his opinion. (R. at 395-396.) The ALJ appropriately did not characterize Dr. Miller's opinion as incomplete or inadequate; he simply commented that Dr. Miller's opinion was "of less value as it is vague as to the degree of 'difficulty' the claimant may experience." (R. at 30.)

Plaintiff is incorrect to suggest that the ALJ's comment was an admission that Dr. Miller's opinion was inadequate or incomplete. The Sixth Circuit and several of its constituent District Courts, including this Court, have held that a consultative examiner's report is not rendered "inadequate or incomplete" due to either the absence of a medical opinion or the inclusion of a "vague" one. *See Dooley*, 656 F. App'x at 121-122 (finding that ALJ was not required to contact consultative examiner whose opinion was found to be vague and unsupported by the evidence); 20 C.F.R. §§ 404.1519n(c)(6), 416.919n(c)(6); *see also Shoults*, 2020 WL 4782859, at *5 (finding that ALJ was not required to contact consultative examiner whose opinion was complete and adequate); *Ingram v. Berryhill*, No. 1:17-cv-2163, 2018 WL 5634345, at *12 (N.D. Ohio Aug. 17, 2018) (same) *report and recommendation adopted,* No. 1:17-cv-2163, 2019 WL 416331 (N.D. Ohio Feb. 1, 2019); *Hamilton v. Comm'r of Soc. Sec.*, No. 1:15-cv-945, 2016 WL 4771238, at *5 (W.D. Mich. Sept. 14, 2016) (same). Accordingly, the ALJ did

not need to re-contact Dr. Miller, as Dr. Miller's opinion was adequate and complete. The Undersigned finds no merit to Plaintiff's second statement of error.

For these reasons, it is **RECOMMENDED** that Plaintiff's contentions of error be **OVERRULED**, and the Commissioner's decision be **AFFIRMED**.

## VII.  CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Based on the foregoing, it is therefore **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

## <u>PROCEDURE ON OBJECTIONS</u>

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed,

31

appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

**Date: January 28, 2021**                    **/s/ *Elizabeth A. Preston Deavers***
                                                                   **ELIZABETH A. PRESTON DEAVERS**
                                                                   **UNITED STATES MAGISTRATE JUDGE**