# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| VICKI L. SNEAD, | : | |
| | : | Case No. 2:19-cv-4831 |
| Plaintiff, | : | JUDGE SARAH D. MORRISON |
| | | MAGISTRATE DEAVERS |
| v. | : | |
| COMMISSIONER OF | | |
| SOCIAL SECURITY, | : | |
| Defendant. | : | |

## OPINION & ORDER

Plaintiff Vicki Snead brings this action under 42 U.S.C. §§ 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits and Supplemental Security Income ("SSI") Benefits.  This matter is before the Court on the Plaintiff's Objection (ECF No. 17) to the Report and Recommendation ("R&R") issued by the United States Magistrate Judge on January 28, 2021 (ECF No. 16). For the following reasons, the Court **OVERRULES** Plaintiff's Objection, **ADOPTS** the R&R, and **AFFIRMS** the Commissioner's decision.

## I. BACKGROUND

The Magistrate Judge accurately described the procedural background as follows. Plaintiff applied for disability insurance benefits and SSI benefits on March 11, 2016, alleging disability beginning November 10, 2015. (R. at 198-207.) Plaintiff's claim was denied initially and upon reconsideration. (R. at 120-131.) Upon request, a hearing was held on October 10, 2018, in which Plaintiff appeared and testified. (R. at 38-56.) A vocational expert ("VE"), George Coleman, also appeared and testified at the hearing. (*Id*.) On October 15, 2018,

1

Administrative Law Judge Timothy G. Keller ("the ALJ") issued a decision finding that Plaintiff was not disabled. (R. at 16-37.) On August 29, 2019, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 2-7.) Plaintiff then timely commenced the instant action. (ECF No. 1.)

## II. RELEVANT HEARING TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff testified at the July 2018 administrative hearing. (R. at 42-53.) Plaintiff testified that she last had a job at a pizza restaurant in 2014 or 2015. (R. at 42.) The ALJ questioned Plaintiff about a possible summer job she had in 2017, and Plaintiff testified that she "was never asked to work there" but she helped a friend run a karaoke system at a bar, and then at a wedding. (R. at 42-43.) Plaintiff testified that she got "a little bit of cash" for the work. (R. at 43.) Plaintiff testified that her friend would get hired to do karaoke, and she would go with him to sing karaoke at the bar. (R. at 43-44.)

Plaintiff testified that she underwent knee surgery in April 2013, and that in 2016 she was trying to regularly exercise on her own by walking. (R. at 44-45.) Plaintiff testified that she was no longer able to work because she "can't keep up." (R. at 45.) Plaintiff testified that she previously worked at a pizza shop, and she was going to be fired because she "couldn't keep up with the pace of things," but then the pizza shop ended up closing anyways. (*Id*.) Plaintiff testified that she wouldn't be able to do a job with strict production demands, even if she was allowed to sit, because of the fast pace, but then stated that it would depend on the job. (R. at 45-46.) Plaintiff testified she previously had worked at a gas station and it was fast-paced and she got confused. (R. at 46.) Plaintiff testified that she would "probably not" be able to do a job standing six out of eight hours without being able to sit down and rest, because the arthritis in her

knees bothers her. (R. at 47.) Plaintiff testified that she has a hard time remembering things, both long-term and short-term. (*Id*.) Plaintiff testified that she has a hard time sleeping due to sleep apnea, and that her sleeplessness depends on the night. (R. at 47-48.)

Plaintiff testified that she has no difficulty dressing herself, but she is unable to lift a 14-pound bag of dog food because she "[doesn't] have a lot of upper body strength to begin with" and she would not be able to "stoop and pick something up from the floor and to be able to push up with [her] knees." (R. at 48.) Plaintiff testified that she is left-handed, but she has no trouble using her left hand for any reason. (R. at 49.) Plaintiff testified that she still has pain from her right knee surgery, and that in January 2018 her doctor, Dr. Morris, told her she "was just going to have to deal with it." (R. at 49-51.)

Plaintiff testified that she drinks alcohol once per week, and keeps a limit of five beers when she drinks. (R. at 51.) Plaintiff testified that she had not been a daily drinker in the last fifteen years.[1] (R. at 52.) Plaintiff testified that she was abused by her father as a child, and that she can get upset if she feels like she's not doing a good enough job. (*Id*.) Plaintiff testified that in 2016, she walked out on a job after one day because she got frustrated. (R. at 52-53.)

## B. Vocational Expert's Testimony

Mr. George Coleman testified as the VE at the administrative hearing. (R. at 53-55.) Based on Plaintiff's age, education, and work experience and the residual functional capacity ultimately determined by the ALJ, the VE testified that a similarly situated hypothetical individual could perform the following jobs that exist in significant numbers in the national

---

[1] The ALJ interrupted Plaintiff's testimony to suggest that in October 2016, Plaintiff reported drinking a twelve-pack of beer per week. (R. at 52.) Plaintiff responded "[t]hat would be an exaggeration," and the ALJ responded that "the exaggeration would be yours, because that's what you said to the doctor." (*Id*.)

economy: office helper, mail room clerk, and parking lot attendant. (R. at 54.)

### III. RELEVANT RECORD EVIDENCE

**A.    James W. Whetstone, M.D.**

Plaintiff received treatment from her primary care physician James W. Whetstone, M.D., at Whetstone Medical Clinic, from January 29, 2015 through April 9, 2018. (R. at 530-572.) In her first appointment on January 29, 2015, Plaintiff complained of snoring loudly and reported bilateral knee joint pain, following a right knee replacement in April 2014. (R. at 562.) Dr. Whetstone determined Plaintiff was not in acute distress, and assessed her to have a Vitamin D deficiency, morbid obesity which was improving, hypothyroidism, generalized osteoarthritis of multiple sites (which was stable), plantar fasciitis, fatigue (which was stable), sleep apnea, and iron deficiency anemia. (R. at 564.) Plaintiff returned to Dr. Whetstone on May 11, 2015, seeking clearance for surgery for plantar fasciitis. (R. at 560-561.)

On September 14, 2015, Plaintiff returned to Dr. Whetstone reporting that she was hit by a slow-moving vehicle while crossing the street on September 1, 2015. (R. at 552-553.) Dr. Whetstone reported that the x-rays "did not reveal any acute fractures but did show degenerative changes in neck, knee, ankle and foot." (R. at 552.) Plaintiff complained of right hip and ankle pain, and Dr. Whetstone found that her hips "did not show full range of motion" and her ankle was swollen and painful at the extreme limits of the range of motion. (R. at 552-553.) Dr. Whetstone also noted that he did not find instability or weakness in Plaintiff's hips. (R. at 553.) Dr. Whetstone assessed that Plaintiff had a right ankle sprain, and a right hip contusion with intact skin surface. (*Id.*)

Plaintiff returned to Dr. Whetstone on November 3, 2016, at which time Dr. Whetstone completed a Physical/Emotional Evaluation form. (R. at 551.) Dr. Whetstone listed Plaintiff's

diagnoses as including Bipolar Disorder, Hypothyroidism, Iron Deficiency Anemic, Osteoarthritis in her right knee, right ankle, left knee, and back. (*Id.*) Dr. Whetstone indicated that Plaintiff had "significant" physical limitations with regard to climbing, crouching/crawling, prolonged standing, and kneeling; that she had "mild" physical limitations with regard to balance, bending, reaching/grasping, and movement in workplace; and that she has no physical limitations with regard to transmitting and receiving information or prolonged sitting. (*Id.*) Dr. Whetstone indicated that Plaintiff had no environmental restrictions. (*Id.*) Finally, Dr. Whetstone indicated that Plaintiff had a "significant" mental health, cognitive, or behavioral limitation with regard to stress tolerance; that she had "mild" mental health, cognitive, or behavioral limitations with regard to memory, sustaining concentration, problem solving, cognition, performing activities of daily life independently, establishing and maintaining relationships, and judgment; and that she had no mental health, cognitive, or behavioral limitations with regard to organizational skills, adaptive skills, interpersonal interactions, or transmitting and receiving information. (*Id.*)

On February 22, 2017, Plaintiff reported to Dr. Whetstone that she was in the process of trying to get disability, and stated that she could not move well due to bilateral lower extremity pain. (R. at 548.) Dr. Whetstone assessed Plaintiff to have chronic peripheral venous insufficiency, obesity/fatigue, hypothyroidism, osteoarthritis of both knees, and iron deficiency anemia. (R. at 548-550.) On March 17, 2017, Plaintiff returned to Dr. Whetstone complaining of left knee pain. (R. at 545-547.) Dr. Whetstone reported that Plaintiff stated that she could not move well due to multiple areas of arthralgia, bilateral lower extremity pain, and morbid obesity. (R. at 545.) Dr. Whetstone assessed Plaintiff to have limb pain, chronic peripheral venous insufficiency, morbid obesity, hypothyroidism, osteoarthritis of both knees, arthralgia in multiple

sites, fatigue, and iron deficiency anemia. (R. at 545-547.)

At the March 17, 2017 appointment, Dr. Whetstone completed a Physical Assessment form for Plaintiff. (R. at 419-420.) Dr. Whetstone indicated that Plaintiff's symptoms were "frequently" severe enough to interfere with the attention and concentration required to perform simple work-related tasks, and that Plaintiff would need to recline or lie down during a hypothetical 8-hour workday in excess of the usual break schedule. (R. at 419.) Dr. Whetstone indicated that Plaintiff can only walk "less than 1 block" without rest or significant pain, that she can sit for seven hours in an eight hour work day, that she can stand/walk for three hours in an eight hour work day, and that Plaintiff would need three to four breaks (10-15 minutes each) during an eight hour work day. (*Id*.) Dr. Whetstone wrote that Plaintiff can "occasionally" lift and carry less than ten pounds in a competitive work situation, but should never lift and carry more than that. (*Id*.) Dr. Whetstone indicated that Plaintiff also has limitations in repetitive reaching, handling, or fingering. (*Id*.) Dr. Whetstone estimated that Plaintiff would likely be absent from work more than four times a month as a result of her impairments or treatments. (R. at 420.)

From March 17, 2017 through February 16, 2018, Plaintiff returned to Dr. Whetstone approximately five more times, and was treated for various colds, headaches, or weight loss issues. (R. at 535-547.) Plaintiff did not complain of any shoulder, knee, hip, or limb pain at these appointments. (*Id*.) At her last appointment on February 16, 2018, Dr. Whetstone assessed Plaintiff to have allergic rhinitis and hypothyroidism. (R. at 536.)

**B.    New Horizons Youth & Family Center**

Plaintiff sought psychiatric treatment at New Horizons Youth & Family Center ("New Horizons") from January 25, 2014 to February 10, 2015. (R. at 332-345.) Her records indicate

she was treated for depression and anxiety, and that she remained "stable" (neither improving or worsening) from appointment to appointment. (*Id.*) Plaintiff only appeared for six appointments, which were approximately once every two months. (*Id.*) Plaintiff's discharge summary, dated June 18, 2015, indicates that Plaintiff presented with Bipolar II Disorder, that she had not achieved her goals, and that she was being discharged because she had not kept scheduled appointments and had not responded to requests to schedule appointments. (R. at 344.)

C.     **Access Ohio Johnson Health; Maryam Niazi, PMHNP**

Plaintiff sought additional psychological counseling at Access Ohio Johnson Health from October 20, 2015 through August 1, 2016. (R. at 351-362, 371-374, 401-415.) At her first visit on October 20, 2015, Plaintiff complained that she didn't feel like she had been helped by New Horizons, and that she "felt that the staff and doctors [at New Horizon] wanted her to be drugged and didn't help her find other coping skills on how to deal with her symptoms." (R. at 351.) Plaintiff reported "that she had bipolar but she doesn't know if she does." (*Id.*) Plaintiff reported that she tends to overeat at times, even when she isn't hungry, and that her pain "comes and goes but mainly hurts during winter months." (R. at 356.)

Plaintiff reported having depression since childhood, resulting in sadness, fatigue, lack of energy, aches and pain, low self-esteem and confidence, her mind going blank, and memory problems. (*Id.*) Plaintiff also stated she has panic attacks during life transitions and getting to work, that she worries constantly about how long she has to live with her mother, and that she does not like change. (*Id.*) Plaintiff also stated that she has a "short fuse," and she finds it difficult to focus and prioritize due to her hot temper and trouble focusing. (R. at 357.) Plaintiff reported that she was sober for five years, but her drinking had gotten worse since splitting up with a boyfriend. (*Id*) Plaintiff stated that she buys alcohol until she runs out of money. (*Id.*)

Plaintiff noted that her psychosocial stressors were "[n]ot finding a second job, being laid off, trying to find transportation, [and] [being] responsible for her bills." (*Id.*) Jennifer Bloom, LSW, provided the intake and concluded that Plaintiff met the criteria for: eating disorder, unspecified; attention deficient hyperactivity disorder, unspecified type; alcohol use, unspecified with other alcohol-induced disorder; bipolar disorder, current episode mixed moderate; dysthymic disorder; and adjustment disorder with anxiety. (R. at 360.) Ms. Bloom stated the "symptoms appear to be chronic," and noted that Plaintiff appeared to be highly motivated for treatment. (*Id.*)

Plaintiff returned for counseling a total of eight times, approximately once per month, between December 30, 2015 and August 1, 2016. (R. at 371-374, 401-415.) During these visits, Plaintiff's primary provider was Maryam Niazi, PMHNP. (*Id.*) On August 1, 2016, Ms. Niazi completed a Mental Status Questionnaire for Plaintiff, for the Opportunities for Ohioans with Disabilities Division of Disability Determination. (R. at 398-400.) In the questionnaire, Ms. Niazi wrote that Plaintiff gets overwhelmed easily due to severe anxiety, that she gets agitated, and that she does not have a learning disability but rather displays lack of insight. (R. at 398.) Ms. Niazi found that Plaintiff has limited cognitive functioning, and wrote that Plaintiff displays lack of judgment, poor coping skills, acts much younger than her age, and is impulsive. (*Id.*)

Ms. Niazi wrote that Plaintiff would be capable of managing any benefits that may be due, but that due to a possible learning disability Plaintiff might be unable to follow instructions. (R. at 399.) Ms. Niazi reported Plaintiff's very poor ability to maintain attention, adding that Plaintiff was "all over the place" and "tangential at times." (*Id.*) When asked how Plaintiff would react to the pressures, in work settings or elsewhere, involved in single and routine, or repetitive, tasks, Ms. Niazi answered that Plaintiff would do "very very poor[ly]" because she is

8

not good with change. (*Id*.) Ms. Niazi observed that Plaintiff gets stuck at one point at a time and displays obsessive tendencies and a tangential thought process. (*Id*.)

On March 8, 2017, Ms. Niazi completed a Mental Capacity Assessment form regarding Plaintiff's ability to do work-related activities on a day-to-day basis in a regular work setting. (R. at 416-418.) Ms. Niazi indicated that Plaintiff had "moderate" and "marked" limitations with regard to her understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (*Id*.)

**D. Integrated Services for Behavioral Health**

Plaintiff also sought psychiatric treatment at Integrated Services for Behavioral Health from April 20, 2017 to June 7, 2018. (R. at 463-483, 573-633.) During her intake appointment on April 20, 2017, Plaintiff stated that she was seeking help with housing and receiving benefits. (R. at 476.) Plaintiff was assessed a GAF score of 48, meaning that she had "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." (R. at 481.) Plaintiff was diagnosed under the DSM-V with Generalized Anxiety Disorder, by meeting the following criteria: "muscle tension; sleep disturbance; being easily fatigued; irritability; restlessness or feeling keyed up or on edge; and the anxiety, worry, or physical symptoms caus[ing] clinically significant distress or impairment." (R. at 482-483.)

Plaintiff returned for approximately fourteen visits between August 11, 2017 and June 7, 2018. (R. at 463-475, 573-633.) On August 11, 2017, Plaintiff denied having a depressed mood, but reported excessive worrying and difficulty controlling her worries. (R. at 468.) On January 11, 2018, Plaintiff reported her depression being "in the middle" and that she had "moderate anxiety" following a domestic violence incident. (R. at 629.) On March 19, 2018, Plaintiff

sought refills of her medications, which the treatment provider wrote "doesn't make sense, because I gave her a RX with 1 refill on January 17." (R. at 607.) At that same appointment, Plaintiff reported that her depression was "not too bad" and that "I haven't really been anxious." (*Id*.) On May 24, 2018, Plaintiff sought more refills of her medications, and the treatment provider again noted that "she should still have at least one refill at her pharmacy." (R. at 594.) Plaintiff reported at that time that she was bored, but that she felt "not too much" depression and "not much" anxiety. (*Id*.) On May 31, 2018, Plaintiff stated that one of her goals of treatment was "[f]inding a part time job," but that transportation was an obstacle to that goal. (R. at 578.) The Progress Note from her last appointment, on June 7, 2018, states that Plaintiff had made no progress from the treatment. (R. at 573.)

E.     **Marc E.W. Miller, Ph.D.**

On June 14, 2016, Plaintiff was evaluated by Dr. Marc Miller, upon referral by the Opportunities for Ohioans with Disabilities, for a psychological evaluation relating to her claim for mental disability benefits. (R. at 392-397.) Dr. Miller noted that he reviewed primary information from New Horizons Mental Health, but no testing was requested or conducted, no supervisee was present, and all information was gathered from Plaintiff. (R. at 392.) Dr. Miller noted that Plaintiff "was a rather poor informant in regard to her memory of dates and specific information due to her long term memory problems," but added that "[n]o inconsistencies were noted when compared to the chart." (R. at 394.)

Plaintiff reported to Dr. Miller complaints regarding her feet, knees, and shoulder, as well as a long history of depression and anxiety. (R. at 392.) Plaintiff described her difficult childhood and personal history for Dr. Miller, and told Dr. Miller that she has had chronic anxiety and depression since age 12 or 13. (R. at 393.) Plaintiff reported two suicide attempts as

10

an adolescent, and more recent suicide attempts around 2010 and 2013. (*Id.*) Plaintiff reported
attending Access Ohio Mental Health twice per month, and that she was being treated for
depression. (*Id.*) Plaintiff reported getting depressed related to money issues, and she stated that
she has a bad relationship with her daughter. (R. at 394.) Plaintiff also complained of agitation,
impatience, and irritability. (*Id.*)

Dr. Miller found that Plaintiff's medical history "suggests she suffers from plantar
fasciitis to both feet and arthritis in her knees and shoulder," and that she has difficulty with left
shoulder pain and anemia. (R. at 393.) Dr. Miller added that Plaintiff is obese, and that she had
a gastric bypass surgery in 2000, a bilateral leg vein surgery, and a partial right knee replacement
surgery after being hit by a car in November 2015. (*Id.*) Dr. Miller noted Plaintiff's "mild to
moderate hearing loss in both ears," and observed that Plaintiff walked with a slow gait and a
significant limp. (R. at 393-394.)

With regard to Plaintiff's sensorium and cognitive functioning, Dr. Miller found that
Plaintiff has difficulty with short and long-term recall, has fair concentration, and has problems
keeping her mind on tasks. (R. at 394.) Dr. Miller found that Plaintiff's executive skills note
moderate problem solving and organizational abilities. (*Id.*) Dr. Miller wrote that Plaintiff's
abstract thinking was poor, and while she was able to follow one or two step instructions,
Plaintiff indicated that she is typically very slow. (*Id.*) Dr. Miller estimated Plaintiff's intellect
to be within the low average range. (*Id.*) Regarding Plaintiff's daily activities, Dr. Miller
reported that Plaintiff goes to bed at all hours, eats two meals per day, has no hobbies, but that
she prepares her own meals and laundry, she does her own housecleaning, and she goes to the
grocery store on her own. (R. at 395.) Dr. Miller also added that Plaintiff reported "always
[taking] care of her own money management." (*Id.*)

11

Dr. Miller assessed that Plaintiff's "abilities and limitations in regard to understanding, remembering, and carrying out one and two step job instructions indicate difficulty." (*Id*.) Dr. Miller noted that Plaintiff was fired from her last job "due to being too slow," and wrote that "[t]his has been a problem for her in regard to employment." (*Id*.) Dr. Miller found that Plaintiff "avoids others and becomes anxious around people," and that "[h]er abilities and limitations in regard to dealing with stress and pressure in a work setting indicate difficulty." (*Id*.) Dr. Miller specifically discussed that Plaintiff has had panic attacks in the past, and that she has issues with anxiety and has difficulty working with the public. (*Id*.)

Dr. Miller concluded that Plaintiff exhibited depression and anxiety. (R. at 396.) Dr. Miller noted that Plaintiff was diagnosed with bipolar disorder by a psychiatrist in the past, but wrote that "[t]here does not appear to be significant evidence of bipolar disorder." (*Id*.) Dr. Miller diagnosed Plaintiff under the DSM-V with dysthymic disorder – moderate to severe, and generalized anxiety disorder – moderate to severe. (*Id*.)

## F.     State Agency Consultants

State Agency consultant Gerald Klyop, M.D., reviewed Plaintiff's file on May 17, 2016, and provided assessments of Plaintiff's physical residual functional capacity. (R. at 86-101.) Specifically, Dr. Klyop found that Plaintiff could occasionally lift and/or carry up to 10 pounds; frequently lift and/or carry less than 10 pounds; stand and/or walk (with normal breaks) for a total of about two hours; sit (with normal breaks) for about six hours in an eight-hour workday; was occasionally limited in climbing ramps/stairs, stooping (i.e., bending at the waist), crouching (i.e., bending at the knees), and crawling; was frequently limited in balancing; was limited in reaching overhead to her left; had no other postural, manipulative, visual, or communicative limitations; and had some environmental limitations, as she "would need to avoid hazards such as working around heights, dangerous moving machinery and driving as part of work due to anemia, obesity." (R. at 96-97.) Dr. Klyop also found that Plaintiff had mild restrictions in her activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties

12

in maintaining concentration, persistence or pace; and no repeated episodes of decompensation. (R. at 93.) Dr. Klyop found Plaintiff to be a "poor historian," and found that her allegations were "not consistent [with] the evidence in file." (R. at 88, 95.)

Dr. Klyop reviewed Dr. Miller's opinion, giving it "great weight" and noting that it was "consistent with the objective evidence in file." (R. at 95.) Dr. Klyop also reviewed a Mental Residual Functional Capacity Assessment provided by Jaime Lai, Psy.D. (R. at 98.) Dr. Lai found that Plaintiff "is limited to performing simple, routine, one to three step tasks in work setting not involving frequent change or fast-paced production." (*Id.*) Dr. Klyop ultimately concluded that Plaintiff was not disabled, with the following explanation:

> You said you were disabled due to depression, anemia, knee pain, obesity, bipolar, left should[er] pain and memory problems. Medical evidence shows that you would have some limitations due to your physical impairments. Evidence shows you can still lift light weight. Although you cannot stand for long periods of time you are able to remain seated for long time periods without any problem. Medical evidence also shows that you would have some limitations due to your mental health symptoms. However, you are still able to think and act in your interest, communicate your needs, and understand, remember and follow simple task instructions. We do not have sufficient vocational information to determine whether you can perform any of your past relevant work. However, based on the evidence in file, we have determined that you can adjust to other work.

(R. at 100-101.)

State Agency consultant Stephen Sutherland, M.D., reviewed Plaintiff's file at the reconsideration level on August 10, 2016, and agreed with most of Dr. Klyop's above assessments. (R. at 103-118.) As to Plaintiff's environmental limitations, Dr. Klyop found that Plaintiff should avoid concentrated exposure to extreme cold and vibration, in addition to avoiding all exposure to hazards. (R. at 114.) Dr. Sutherland reviewed Ms. Diaz's opinion as well as Dr. Miller's opinion, affording Ms. Diaz's opinion "little weight" because "[h]er opinion was not justified or supported by other file evidence," and affording Dr. Miller's opinion "great weight" because it was "consistent with the objective evidence in file." (R. at 112.)

Dr. Sutherland also reviewed a Mental Residual Functional Capacity Assessment

provided by Stanley Kravitz, Ph.D. (R. at 115-116.) Dr. Kravitz found that Plaintiff "is limited to performing simple, routine, one to three step tasks in work settings not involving frequent change or fast-paced production." (R. at 115.) Dr. Sutherland also concluded that Plaintiff was "Not Disabled," and provided following explanation:

> On your application, you stated you were disabled due to depression, anemia, knee pain, obesity, bipolar, left should[er] pain and memory problems. On appeal, you alleged problems with your hearing. Medical records show that you can recognize 100% of words. Your condition does prevent prolonged standing and walking. However, you would be able to walk and/or stand for a couple of hours of the workday and can sit for at least 6 hours of a workday with normal breaks. You can perform light amounts of lifting or approximately 5 pounds on a regular basis not to exceed 10 pounds. You are still able to understand, remember, and carry out simple work-related instructions. We do not have sufficient vocational information to determine whether you can perform any of your past relevant work. However, based on the evidence in file, we have determined that you can adjust to other work.

(R. at 118.)

## IV.    ADMINISTRATIVE DECISION

On October 15, 2018, the ALJ issued his decision. (R. at 16-37.) At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff has not engaged in any disqualifying

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

14

substantial gainful activity since January 28, 2016. (R. at 22.) At step two, the ALJ found that Plaintiff has the following severe impairments: obesity; degenerative joint disease of the bilateral knees; anemia; left shoulder tendonitis; varicose veins; depressive disorder; anxiety disorder; and bipolar disorder. (*Id.*) The ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23.)

At step four of the sequential process, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she is limited to occasional climbing of ramps or stairs; never climbing ladders, ropes, or scaffolds; frequent balancing; occasional stooping, kneeling, crouching, or crawling; no exposure to moving machinery or unprotected heights; occasional exposure to extreme cold and vibration; and no commercial driving. Mentally, she retains the ability to understand, remember, and carry out simple repetitive tasks and she is able to adapt to simple changes and avoid hazards in a setting without strict production quotas.

(R. at 25.) The ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. at 26.)

The ALJ addressed each of Plaintiff's impairments. First, for Plaintiff's alleged knee pain, the ALJ noted that Plaintiff's complaints were intermittent, and the ALJ cited medical records from 2016, 2017, and 2018 in which Plaintiff reported no muscle aches or joint pain/arthralgias, then reported of pain and stiffness, and then did not report any knee pain. (R. at

---

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

26.) The ALJ also reviewed Plaintiff's physical examinations, finding that they were "generally unremarkable," and while Plaintiff sometimes displayed a slow gait and/or a limp, she also displayed a normal gait and stance by March 2017. (*Id*.) Finally, the ALJ noted that diagnostic imaging for Plaintiff's knee was "largely unremarkable as well." (R. at 27.) Next, the ALJ analyzed Plaintiff's left shoulder pain, concluding that while "the record shows some complaints of pain, [] these complaints were intermittent and no significant findings in the shoulder were noted upon examination." (*Id*.) The ALJ considered Plaintiff's left shoulder impairing in limiting her to the light level of exertion, but wrote that "a lack of recent complaints of shoulder pain supports no further specific manipulative limitations due to this condition." (*Id*.) The ALJ also reviewed Plaintiff's varicose vein impairment and obesity in determining her exertional level, postural, and environmental limitations. (*Id*.)

The ALJ also spent considerable time reviewing Plaintiff's mental limitations, concluding that "[t]he record is also not fully supportive of the degree of mental limitation [Plaintiff] has alleged." (R. at 27-31.) The ALJ cited Plaintiff's inconsistent complaints and examinations, dating from 2015 through 2018 that "are particularly illuminating as they reveal a depressed and anxious mood at times, but are generally unremarkable otherwise." (*Id*.)

The ALJ also considered several medical opinions. (R. at 29-31.) First, the ALJ considered the reviewing physician opinions with the State Agency Division of Disability Determinations, at both the initial and reconsideration levels, affording them little weight because "their opinions are simply not well-supported by the medical evidence of record." (R. at 29.) Next, the ALJ considered the State Agency psychological consultants at the initial and reconsideration levels, affording them some weight. (R. at 29-30.) The ALJ did not accept their mental RFC conclusions wholesale, finding that "there is new and material evidence," and that "these opinions are only partly supported by the more recent objective record, which shows an intermittent history of complaints of depression and anxiety, but very few findings during mental status examinations." (*Id*.)

16

The ALJ also considered Dr. Miller's June 14, 2016 opinion, giving the opinion some weight "as it was made after a thorough examination of the [Plaintiff] and is somewhat consistent with the broader record." (R. at 30.) The ALJ found that Dr. Miller's opinion was vague as to the degree of difficulty Plaintiff may experience, and that "the record supports a greater aptitude socially than [Dr. Miller] opined." (*Id.*) The ALJ next reviewed Ms. Niazi's opinion, affording it little weight because "Ms. Niazi does not qualify as an 'acceptable medical source' as defined by 20 CFR 416.902" and "[m]ore importantly, Ms. Niazi's opinions are highly inconsistent with the objective record." (*Id.*) The ALJ reviewed Dr. Whetstone's March 17, 2017 opinion, but also gave it little weight because "[t]his opinion is not supported in the broader objective medical record, and it does not include any narrative support for the severe limitations." (R. at 30-31.) Finally, the ALJ also reviewed Dr. Whetstone's November 3, 2016 opinion, giving it more weight, "as it is a closer reflection of [Plaintiff's] limitations as supported by the objective record." (R. at 31.)

Relying on testimony from the VE, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, she can perform jobs that exist in significant numbers in the national economy, including office helper, mail room clerk, and parking lot attendant. (R. at 31-32.) He therefore concluded that Plaintiff was not disabled under the Social Security Act. (*Id.*)

## V. STANDARD OF REVIEW

If a party objects within the allotted time to a report and recommendation, the Court "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b). Upon review, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). The Court's review "is limited to determining whether the Commissioner's decision 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Ealy v. Comm'r of Soc. Sec.,* 594 F.3d 504, 512 (6th Cir. 2010) (quoting *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234,

241 (6th Cir. 2007)); *see also,* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social

Security as to any fact, if supported by substantial evidence, shall be conclusive").  The

substantial-evidence standard is met if a "reasonable mind might accept the relevant  evidence as

adequate to support a conclusion." *Warner v. Comm'r of Soc. Sec*., 375 F.3d 387, 390 (6th Cir.

2004).

## VI. ANALYSIS

Plaintiff's single, timely Objection to the R&R is a re-hash of her argument before the

Magistrate Judge; that is, the ALJ's decision is not supported by substantial evidence. (Doc. 17.)

Particularly, Plaintiff argues that the ALJ's RFC ignores the more restrictive opinions from Dr.

Whetstone, Dr. Miller, Dr. Diaz, and the state agency experts Social Security hired to review her

records. (ECF No. 17, PageID 761.) Like the R&R, the undersigned interprets this argument to

be two-fold: first, that the ALJ failed to afford proper weight to Dr. Whetstone's opinion as a

treating provider; and second, that the no substantial evidence supported the RFC.

## A.    Treating Physician

The ALJ must consider all medical opinions that she or he receives in evaluating a

claimant's case. 20 C.F.R. § 404.1527(c).  However, the ALJ typically gives deference to a

treating physician's opinion on the claimant's capacity because "these sources are likely to be the

medical professionals most able to provide a detailed, longitudinal picture of [a claimant's]

medical impairment(s) and may bring a unique perspective to the medical evidence that cannot

be obtained from the objective medical filings alone . . . ." 20 C.F.R. § 404.1527(c)(2). If the

treating physician's opinion is "well supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in [the

claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

18

If the ALJ does not assign controlling weight to a treating physician's opinion, then the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, the ALJ must:

> apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id*. While the ALJ need not "expressly" consider each of the *Wilson* factors within the written decision, the ALJ must "always give good reasons" as to the weight the ALJ assigns to a treating source's opinions. *Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010); 20 C.F.R. § 404.1527(c)(2). The good-reason requirement "exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that h[er] physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citation omitted).

A plaintiff's RFC "is defined as the 'most a [claimant] can still do despite [the claimant's] limitations.'" *Sullivan v. Comm'r of Social Sec.*, 595 Fed. Appx. 502, 505 (6th Cir. Dec. 12, 2014) (quoting 20 C.F.R. §§ 404.1545(a)(1)); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009). The determination of a claimant's RFC and whether the claimant meets the statutory definition of "disabled" are issues reserved to the Commissioner. 20 C.F.R. § 404.1527(d), 20 C.F.R. §§ 404.1527(e), 416.927(e). Accordingly, "[a]lthough the ALJ will

consider opinions of treating physicians 'on the nature and severity of [a claimant's] impairment(s),' opinions on issues reserved to the Commissioner are generally not entitled to special significance." *Long v. Comm'r of Soc. Sec*., No. 2:19-cv-4247, 2020 U.S. Dist. LEXIS 63760, at *17-20 (S.D. Ohio Apr. 13, 2020)(Vascura, M.J.)(quoting 20 C.F.R. § 404.1527(d))(citation omitted).

Here, the ALJ assigned Dr. Whetstone's opinion little weight because it was "not supported in the broader objective medical record," and it did "not include any narrative support for the severe limitations." (R. at 31.) The ALJ reasoned that "both the physical examinations and the diagnostic imaging in the record [we]re largely unremarkable. There [wa]s no objective evidence that would support such severe physical limitations." *Id*. Additionally, the ALJ determined that Plaintiff "herself testified to lesser limitations that those set out" in Dr. Whetstone's opinion." *Id*. The ALJ considered the supportability of the opinion as well as the consistency of the opinion with the record as a whole when determining to assign Dr. Whetstone's opinion little weight. Hence, the ALJ satisfied *Wilson* and substantial evidence provided a "good reason" for assigning little weight to the treating physician's position. Furthermore, the R&R properly noted that Plaintiff did not challenge any of the ALJ's stated bases.  (ECF No. 16, PageID 751.) For these reasons, Plaintiff's treating physician objection is **OVERRULED**.

## B.    Substantial Evidence

As noted, the determination of a claimant's RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). Regardless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09-cv-411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010)(Hogan, M.J.). Substantial evidence means "more than a scintilla

of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Hum. Servs*., 25 F.3d 284, 286 (6th Cir. 1994)). The standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Snead argues that because the ALJ's RFC deviates from the opinions of Dr. Miller, Dr. Diaz, and the state agency experts Social Security hired, it is not supported by substantial evidence. Yet, "[t]he presence of substantial evidence to support the opposite conclusion says nothing about whether the record would permit either conclusion to be drawn, and has consistently been rejected as a basis for overturning an ALJ's decision." *Hesson ex rel. JDH v. Comm'r of Sec. Sec*., No. 2:13–cv–926, 2014 WL 4704797, *6 (S.D. Ohio Sept. 22, 2014) (Kemp, M.J.)(citation omitted). As the R&R provides, "'there is no regulatory requirement that an ALJ adopt every facet of a particular medical opinion in formulating an RFC, so long as the record as a whole supports the RFC actually determined by the ALJ, and she adequately explains her analysis in a manner sufficient to allow review.'" (ECF No. 16, PageID 754)(quoting *Kincaid v. Comm'r of Soc. Sec*., No. 1:16-cv-736, 2017 WL 9515966, at *3 (S.D. Ohio June 12, 2017)(Bowman, M.J.)), report and recommendation adopted, No. 1:16-cv-736, 2017 WL 4334194. And, the ALJ is not required to adopt a state agency consultant's opinions or restrictions. *Reeves v. Comm'r of Soc. Sec*., 618 F. App's 267, 275 (6th Cir. 2015.)

The focus is on whether the RFC is supported by substantial evidence. "In determining the existence of substantial evidence, this court must examine the administrative record as a whole." *Cutlip*, 25 F.3d 284, 286 (6th Cir. 1994). That record includes substantial evidence supporting the ALJ's conclusions aptly summarized by the Magistrate as follows:

21

(1) Plaintiff's physical examinations, which were generally unremarkable
aside from intermittent pain and tenderness;
(2) Plaintiff's diagnostic imaging, which was unremarkable;
(3) Plaintiff's hearing testimony, which was at least partially inconsistent
with Plaintiff's argument that she needed to be limited to sedentary work;
and
(4) Plaintiff's mental examinations, which "reveal a depressed and anxious
mood at times, but are generally unremarkable otherwise."

(R. at 25-31.) In sum, the Court determines after *de novo* review that the ALJ's decision was within the permissible zone of choice, and that the assessed RFC is supported by substantial evidence. Plaintiff's substantial evidence Objection is **OVERRULED**.

## VII.    CONCLUSION

Based upon the foregoing, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, and after a *de novo* determination of the record, this Court concludes that Plaintiff's Objection to the R&R of the Magistrate Judge is without merit. The Court thus **OVERRULES** the Plaintiff's Objection (ECF No. 17), **ADOPTS** the Magistrate Judge's R&R (ECF No. 16), and **AFFIRMS** the Commissioner's decision.

The Clerk is **DIRECTED** to **ENTER JUDGMENT** in accordance with this Order and terminate this case from the docket records of the United States District Court for the Southern District of Ohio, Eastern Division.

**IT IS SO ORDERED**.

/s/Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**